MISSISSIPPI STATE HIGHWAY COMMISSION, APPELLANT *v.* O. A. WEAR (ALSO KNOWN AS O. A. WARE) et ux., APPELLEES

No. 43635 May 24, 1965 175 So. 2d 508

*J. O. Clark, Finch & Finch,* Iuka, for appellant.

*Smith & Smith,* Corinth, for appellee.

PATTERSON, J.

The Mississippi State Highway Commission, appellant, filed this eminent domain proceeding against O. A. Wear and wife seeking a right-of-way, less the minerals, through the farm of Wear for the Natchez Trace Parkway, a limited access roadway. A special court of eminent domain awarded Wear damages in the sum of $12,000 from which he appealed to the Circuit Court of Tishomingo County where he received a verdict in the amount of $18,500. The Highway Commission appeals

from the judgment entered thereon, assigning as error the following:

1. That the lower court erred in the admission of testimony by the appellees relating to a separate value upon a rock formation situated upon the lands of the appellees to be taken by the appellant, and in the admission of evidence of the commercial potential value of the rock formation.

2. That there was no evidence to support the verdict of the jury in the sum of $18,500 for damages, which was against the overwhelming weight of the evidence and so excessive as to denote bias, passion, and prejudice on the part of the jury.

The appellees are the owners of 216.75 acres on which they live and operate a farm. The farm is located in Tishomingo County, Mississippi. Approximately 100 acres of the total farm are in cultivation, consisting of cotton, corn and hay crops. The Highway Commission sought a right-of-way consisting of 56.71 acres across this farm for the Natchez Trace Parkway. The right-of-way enters the northeast corner of appellees' farm and continues in a southwesterly direction to the west boundary thereof. Sixteen acres on which no improvements are situated will be cut off on the north or northwesterly side of the right-of-way to which there will be no direct access except for an underpass with a height of six feet and a minimum width of four feet under the actual roadway. Wear will have the use and benefit of this underpass as an accessway from the 16 acres to the remaining 144.04 acres on the south side of the right-of-way provided that he fences and maintains a lane from the right-of-way to the underpass.

Prior to this suit the Wears had 14.3 acres in cotton, approximately 35 acres in corn and sufficient pasture for 31 head of cattle. Of the 56.71 acres within the right-of-way there will be taken 1-1/3 acres of cotton, 11-1/2 acres of pasture, 5-1/2 acres in hay ground and 2 acres

in hay. Of the 16 acres that will be severed from the main part of the farm by the right-of-way 10 acres are cultivated in cotton and the rest is in pasture and timber. Appellees will have remaining south of the right-of-way and upon the main portion of the farm 27.5 acres in cultivation and 41.5 acres in pasture.

There will be taken within the right-of-way an area of approximately 13.7 acres which is composed of sandstone. This sandstone formation has a thickness of from approximately 42 to 46 feet over said area with an overburden of top soil and gravel from zero to about 19 feet.

Appellees mined from the sandstone area approximately 40 tons of stone more than fourteen years ago and approximately 400 tons about eight or ten years ago for which they received one dollar per ton royalty. The area is not presently being mined as, according to the testimony of the owner, he is saving the sandstone for his retirement.

The evidence is abundant that there is a ready market for the sandstone and that the normal royalty payment for such is one dollar per ton. The record further reflects that sandstone of this type is normally removed by open pit mining from the surface and that it is not economically feasible to remove the same by sub-surface operation. The instrument by which the Highway Department seeks the land reserves to the landowner all minerals, but prohibits mining activities upon its right-of-way, leaving the inescapable inference that the condemnation will also take the sandstone as it cannot be mined.

The landowner in making his proof used three witnesses to show that there is a market for stone of this type and that its value is one dollar per ton to the landowner. A geologist was introduced who testified to the extent of the area and thickness of the rock formation within the right-of-way of appellee's land. An appraiser

was also introduced by the landowner who testified that the land had a before taking value of $51,950 and an after taking value of $20,750.50. On cross examination this witness testified that he had included within the before taking value the sum of $20,000 for five acres of sandstone actually under the proposed roadway. This figure was this witness's best judgment as to the value of such stone as he was not an expert mineralogist, though he was an expert appraiser and familiar with lands and values generally in this particular sector.

The landowner himself testified as to a before taking value of $58,750 and an after taking value of $20,000. He admitted on cross examination that in considering the before taking value he had included the sum of $20,637.50 as the value of the stone. The Commission offered only one witness as to the value of the land, who testified that the before taking value was $13,080 and the after taking value $5,180. This witness was frank to state that he did not consider the rock deposit in his appraisal or testimony as to values.

It is noted from the testimony of the landowner and his appraiser that each included the stone deposit as a part of the whole farm unit in arriving at the before taking value, that is, it was considered as a part of the farm and not separately. Both were extensively cross examined by the Highway Commission as to the ascertainment of the value placed upon the sandstone deposit; each testifying that it was considered with the farm as a unit and not separately though they did give a separate value as to the same on cross examination. The appraiser, though not an expert on stone or quarries, had the benefit of the knowledge he had gained as an appraiser over an extended period of time. He also had the benefit of knowledge. he had gained from experts in the field of sandstone and the benefit of knowledge of the extent of the deposit gained from the state geologist Lusk.

■■■ ■■ The appellant's first assignment of error relating to a separate value upon the rock formation situated upon the lands of the appellee is not well taken. We find that 1 Orgel, *Eminent Domain* section 165, at 171 (2d ed.), states the rule as follows:

The courts have generally rejected these attempts to introduce into evidence the various forms of earnings and profits data. They have usually stated that the measure of compensation in the mine and quarry cases, as in other eminent domain cases, is the market value of the land, but that the stone or mineral deposits may be considered as bearing on the market value of the land. Accordingly, it is proper to admit evidence that the land contains valuable minerals deposits, but the award may not be reached by separately evaluating the land and deposits.

And in 4 Nichols, *Eminent Domain* section 13.22 at 408-414 (3d ed. 1962) we find the following:

The same general rule which applies to vegetable growths and their effect upon market value applies also to mineral deposits in or on such land. The rule is widely prevalent in this country that the existence of mineral deposits in or on land is an element to be considered in determining the market value of such land. However, the mere possibility or even the known existence of mineral deposits is not enough to warrant consideration thereof unless it is shown that they are present in quantity sufficient to justify commercial exploitation. It is not necessary, however, to show that mining operations are actually in existence, although it has been held that in dealing with subsurface deposits no consideration can be given to unopened mines.

Also, as in the case of vegetable growths, the rule has been correlatively stated that the value of such mineral deposits cannot be separately determined independently of the land of which it is a part. It

cannot be considered as so much potential merchandise to be evaluated as such. The land taken must be valued as land with the factor of mineral deposits given due consideration. In determining the just compensation to be paid to the owner it is not permissible to aggregate the value of the land and the value of the deposit. Thus, the value of land as stone land suitable for quarrying — but not the value of the stone separate from the land—is a proper subject of consideration both by the witnesses and the jury in fixing the amount of just compensation to be awarded. The value of the land is not measured by such facts. The stone is a component part of the land. However, while the profits, price or value of the minerals, taken separately, may not be considered, yet the value, extent and quality of such minerals as exist upon the land may be considered. If the extent and quality and value of the stone as it lies on the land may not be considered, there would be no way by which the value of the land with the minerals could be shown. All legitimate evidence tending to establish the value of the land with the minerals in it is permissible. This is not to say that such minerals are to be separately evaluated but that consideration may be given to the quantity of the mineral that can be extracted and to the value thereof purely as evidence for arriving at the value of the land. If a piece of land contains valuable improvements, those improvements apart from the land may not be considered. But certainly the character, nature, and extent of the improvements and the revenue derived therefrom are as essential to be considered in arriving at the value of the land as the land itself or the uses to which it may be put.

This is also the rule recognized within this state. See *Foster v. Mississippi State Highway Commission*, 244 Miss. 57, 140 So. 2d 267 (1962) which announces this rule:

> Likewise it was said that evidence of the value of the trees was admissible for consideration by the jury in arriving at the value of the land, but not as constituting a separate item of damage. (244 Miss. at 63).

This case further cites with approval and quotes from *Mississippi State Highway Commission v. Ladner*, 243 Miss. 278, 137 So. 2d 781 (1962) as follows:

> In Mississippi State Highway Commission v. Ladner, 243 Miss. 781, 137 So. 2d 781, it was said: "Every factor having a legitimate bearing on the before or after value of the land may be put in evidence. This includes specific items affecting the depreciated value, but they may not be shown as separate items of damage. Such specific items may be shown by the testimony if the witness testifies in accordance with the before and after rule and connects such specific items with the before and after fair market values, and considers them only as bearing upon such market values." See also Mississippi State Highway Commission v. Ladner, (Miss. 1962), 137 So. 2d 784. (244 Miss. at 64).

We hold that the first assignment of error is without merit.

 █ The appellant's second assignment of error as to the verdict of the jury being so excessive as to denote bias, passion, and prejudice on the part of the jury is also not well taken.

We have carefully reviewed the evidence and related the pertinent facts to other similar eminent domain cases decided in recent years and we cannot say that the award of $18,500 was excessive to the extent that it evinced bias, passion and prejudice on the part of the jury. Although generous, the award rendered was consistent with and supported by the evidence. Cf. *Mississippi State Highway Commission v. Pepper*, 250 Miss. 755, 168 So. 2d 307; *Mississippi State Highway Com-*

*mission v. Valentine,* 239 Miss. 890, 124 So. 2d 690 (1960) ; *McDuffie v. Mississippi State Highway Commission,* 239 Miss. 518, 124 So. 2d 284 (1960).

Affirmed.

*Lee, C. J., and Ethridge, Rodgers and Inzer, JJ.,* concur.